[No. D043173. Fourth Dist., Div. One. Dec. 10, 2004.]

IN RE TOBACCO CASES I

COUNSEL

McKenna Long & Aldridge, Robert S. Brewer, Jr., Robert A. Cocchia; Levin & Ginsburg, Joseph A. Ginsburg, Jonathan M. Weis and Michael Sarafin for Defendant and Appellant.

Kirkland & Ellis, Stephen R. Patton, Elli Leibenstein, Douglas G. Smith; Kirkland & Ellis, Michelle Schultz; Arnold & Porter, Ronald C. Redcay and John D. Lombardo for Brown & Williamson Tobacco Corporation, R.J. Reynolds Tobacco Company, Lorillard Tobacco Company and Philip Morris USA Inc., as Amici Curiae on behalf of Defendant and Appellant.

Bill Lockyer, Attorney General, Tom Greene, Chief Assistant Attorney General, Dennis Eckhart, Assistant Attorney General, Jeanne Finberg and Peter M. Williams, Deputy Attorneys General, for Plaintiff and Respondent.

Jim Petro, Attorney General (Ohio) and Susan C. Walker, Assistant Attorney General, for 41 states, the District of Columbia, the Commonwealth of Puerto Rico and four United States territories as Amici Curiae on behalf of Plaintiff and Respondent.

OPINION

**McDONALD, J.**—House of Prince, A/S, a Danish corporation (HOP), appeals an order denying its motion to compel arbitration of the application (Application) of the State of California (State) to the superior court for enforcement of the master settlement agreement (MSA), to which HOP and State are parties. HOP contends the trial court erred by concluding the MSA's arbitration clause does not require arbitration of the claims asserted by State in the Application.

## FACTUAL AND PROCEDURAL BACKGROUND

On November 23, 1998, the Attorneys General of State, 45 other states, the District of Columbia, the Commonwealth of Puerto Rico, and four United States territories (together the Settling States) entered into the MSA with four manufacturers of tobacco products, known as the original participating manufacturers (OPM's), to contractually settle certain of the Settling States' pending and potential civil claims against the OPM's. On August 19, 1999, HOP became a party to the MSA as one of the subsequent participating manufacturers (SPM's).

Under the MSA's provisions, OPM's and SPM's must make annual payments to the Settling States based on their respective market shares of cigarettes sold in the United States. The MSA requires each OPM and SPM to annually report to the designated independent auditor (Auditor) its sales of tobacco products, and the Auditor then calculates the market share and required annual payment of each by applying the MSA's formula.[1] The MSA also provides for the entry of consent decrees permanently enjoining OPM's and SPM's from marketing tobacco products to persons under the age of 18 years and from engaging in certain other marketing activities. The MSA's provisions apply to all OPM's and SPM's "in their corporate capacit[ies] acting through their respective successors and assigns, directors, officers, employees, agents, subsidiaries, divisions, or other internal organizational units of any kind or any other entities acting in concert or participation with them."

On February 14, 2003, State filed the Application against HOP with the trial court, alleging, inter alia, that:

"15. House of Prince Riga [hereafter, Riga] manufactures cigarettes to be shipped and sold in the United States on behalf of, and under the supervision and control of, [HOP]. [Riga] is located in Latvia. At the time [HOP] executed the MSA, [Riga] was its subsidiary. [Riga] remained a subsidiary of [HOP] until sometime in August of 2002 when the parent company of [HOP] effected a corporate reorganization whereby [HOP] and [Riga] became sister companies or affiliates. [HOP manufactures] and sells cigarettes in the United States through contractual arrangements between [Riga] and [HOP's] United States distributors. [HOP's] United States distributors are Carolina Tobacco˙ and Leonidias Trading Company. Leonidias Trading Company is an affiliate of Cigarettes Cheaper. [¶] . . . [¶]

"17. On [HOP's] behalf, and under [HOP's] supervision and control, [Riga] made cigarettes for sale in the United States. However, [HOP], as a

---

[1] Pursuant to the MSA's formula, Auditor then calculates how the aggregate annual payments are to be apportioned among and distributed to the Settling States.

signatory to the MSA, did not report the sales of those cigarettes to [Auditor,] as required under the MSA. . . . [¶] . . . [¶]

"18. [HOP] is avoiding the obligations and restrictions of the MSA, and is avoiding, or substantially decreasing, its financial obligations to [State] and the other Settling States by utilizing [Riga's] resources to produce cigarettes intended to be sold in the United States and then failing to report those cigarettes to [Auditor] and otherwise treating those cigarettes as outside the MSA. By failing to treat cigarettes made by [Riga] as subject to the provisions of the MSA, [HOP] has failed to fulfill its obligations under the MSA.

"19. The actions of [HOP] impermissibly threaten to circumvent the application of the MSA's advertising and marketing restrictions implemented to protect the health of the citizens of [State] and the other Settling States on the cigarettes at issue in this Application. This conduct also results in annual payments by [HOP] that are substantially less than actually owed to [State] and the other Settling States under the MSA.

"20. [Auditor's] calculation of [HOP's] payments due under the MSA should have included, but because of [HOP's] failure to report did not include, payments attributable to cigarettes sold in the United States that were manufactured by [Riga]. For the years 1999 through 2001, [HOP] has withheld from the Settling States approximately $60 million. Of this amount, [State] is entitled to over $7 million pursuant to the terms of the MSA."

In the Application State seeks a trial court enforcement order directing HOP to: (1) treat all cigarettes manufactured by Riga and sold in the United States as subject to the MSA's restrictions on marketing activities; (2) provide an accounting of all cigarettes manufactured by Riga and sold in the United States; and (3) pay all amounts HOP should have but has not paid pursuant to the terms of the MSA. The request for payment was based on HOP's alleged failure to report to the Auditor cigarettes manufactured by Riga and sold in the United States.

On August 12 HOP, by special appearance, filed a motion to compel arbitration of the claims asserted in the Application. HOP argued that the MSA's arbitration clause requires those claims be arbitrated. HOP cited section XI(c) of the MSA, which provides: "Resolution of Disputes. *Any dispute, controversy or claim arising out of or relating to calculations performed by, or any determinations made by, [Auditor]* (including, without limitation, any dispute concerning the operation or application of any of the adjustments, reductions, offsets, carry-forwards and allocations described in subsection IX(j) or subsection XI(i)) *shall be submitted to binding arbitration*

before a panel of three neutral arbitrators, each of whom shall be a former Article III federal judge. Each of the two sides to the dispute shall select one arbitrator. The two arbitrators so selected shall select the third arbitrator. The arbitration shall be governed by the United States Federal Arbitration Act." (Italics added.) In support of its motion, HOP submitted a declaration of its counsel, Jonathan M. Weis, to which was attached a September 8, 1999 letter sent to HOP by Attorney Laurie J. Loveland, whom Weis states was counsel for the Settling States.

State opposed HOP's motion to compel arbitration, arguing the plain language of the MSA's arbitration clause shows the claims asserted by State in the Application are not subject to arbitration. State argued that pursuant to section VII(a)(1) of the MSA, the trial court has exclusive jurisdiction to interpret the MSA and decide State's claims asserted in the Application. Section VII(a) of the MSA provides: "Jurisdiction. Each [OPM and SPM] and each Settling State acknowledge[s] that the Court: (1) has jurisdiction over the subject matter of the action identified in Exhibit D in such Settling State and over each [OPM and SPM]; (2) shall retain exclusive jurisdiction for the purposes of implementing and enforcing [the MSA] and the Consent Decree as to such Settling State; and (3) except as provided in subsections IX(d), XI(c) and XVII(d) and Exhibit O, shall be the only court to which disputes under [the MSA] or the Consent Decree are presented as to such Settling State. . . ."[2] State argued the claims it asserted in the Application did *not* "aris[e] out of or relat[e] to calculations performed by [Auditor]" pursuant to the MSA's arbitration clause, but rather involved the issue of whether HOP's obligations under the MSA apply to cigarettes manufactured by Riga and sold in the United States. State argued its claims depend entirely on interpretation of section VII(e) of the MSA, which provides: "Applicability. [The MSA] and the Consent Decree apply only to the [OPM's and SPM's] in their corporate capacit[ies] acting through their respective successors and assigns, directors, officers, employees, agents, subsidiaries, divisions, or other internal organizational units of any kind or any other entities acting in concert or participation with them. The remedies, penalties and sanctions that may be imposed or assessed in connection with a breach or violation of [the MSA] or the Consent Decree (or any Declaratory Order or Enforcement Order issued in connection with [the MSA] or the Consent Decree) shall only apply to the [OPM's and SPM's], and shall not be imposed or assessed against any employee, officer or director of any [OPM or SPM], or against any other person or entity as a consequence of such breach or violation, and the Court shall have no jurisdiction to do so." State argued the trial court "must

---

[2] The MSA defines the "Court" as: "the respective court in each Settling State to which [the MSA] and the Consent Decree are presented for approval and/or entry as to that Settling State." The parties agree the trial court in this matter constitutes the Court as defined in the MSA.

determine whether [Riga] is a subsidiary, or other entity acting in concert or participation, with HOP. If so, the cigarettes in question are subject to the MSA payments."

In its reply, HOP argued State's interpretation of the MSA's arbitration clause was not supported by either its language or applicable law. It argued that because "any determinations" made by Auditor were subject to arbitration, the claims asserted by State in the Application were necessarily subject to the MSA's arbitration clause. HOP also argued that if the MSA's arbitration clause is reasonably susceptible of both State's and HOP's proffered interpretations, the trial court should resolve any ambiguity in favor of arbitration. In support of its reply, HOP attached another declaration of Weis, to which was attached a February 1, 2000 memorandum sent by Loveland to the "Technical Working Group" regarding the MSA.

On September 19 the trial court issued its tentative ruling denying HOP's motion to compel arbitration, stating:

"[T]he arbitration clause at issue is expressly limited in scope and does not require arbitration of the particular issue raised in this case. [¶] . . . [¶]

"In light of the clear language of the [arbitration clause's] phrase which defines [the] types of 'disputes' that require arbitration, namely 'calculations performed . . . or any determinations made by, [Auditor],' the meaning of the arbitration clause is plain and clear: only disputes involving calculations or determinations made by [Auditor] require arbitration. Had the arbitration clause not contained any defining language restricting its scope, the clause could be read broadly enough to encompass the issues presented by the instant action. However, the clause clearly contains such restricting language and cannot therefore be fairly read to include within its scope any issues, other than, e.g., accounting or financial issues, addressed or made by [Auditor].

"Here, it is uncontested that [Auditor] has not made any calculations or determinations. Just as important, [Auditor] has not made any calculations or determinations not because [State] has failed to submit the necessary information to [Auditor], but rather because [HOP] itself refused to submit the required information to the Auditor. As a result, [HOP's] actions or omissions have given rise to this case."

Following oral argument, the court issued an order confirming its tentative ruling.

HOP timely filed a notice of appeal.[3] In addition to the parties' briefs, we have accepted and reviewed amici curiae briefs from Brown & Williamson Tobacco Corporation, R.J. Reynolds Tobacco Company, Lorillard Tobacco Company and Philip Morris USA Inc. in support of HOP's appeal and from 41 states, the District of Columbia, and the Commonwealth of Puerto Rico in support of State's position.[4]

## DISCUSSION

### I

*Arbitration Generally*

■ Code of Civil Procedure section 1280 et seq.[5] sets forth "a comprehensive statutory scheme regulating private arbitration in this state." (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 9 [10 Cal.Rptr.2d 183, 832 P.2d 899].) "Through this detailed statutory scheme, the Legislature has expressed a 'strong public policy in favor of arbitration as a speedy and relatively inexpensive means of dispute resolution.' [Citations]. Consequently, courts will ' "indulge every intendment to give effect to such proceedings." ' [Citations.]" (*Ibid.*)

■ "California law, like federal law, favors enforcement of valid arbitration agreements. [Citation.]" (*Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 97 [99 Cal.Rptr.2d 745, 6 P.3d 669].) Section 1281 provides: "A written agreement to submit to arbitration an existing controversy or a controversy thereafter arising is valid, enforceable and irrevocable, save upon such grounds as exist for the revocation of any contract." "California has a strong public policy in favor of arbitration and any doubts regarding the arbitrability of a dispute are resolved in favor of arbitration. [Citations.]" (*Coast Plaza Doctors Hospital v. Blue Cross of California* (2000) 83 Cal.App.4th 677, 686 [99 Cal.Rptr.2d 809].) However,

---

[3] Pursuant to Code of Civil Procedure section 1294, "[a]n aggrieved party may appeal from: [¶] (a) [a]n order . . . denying a petition to compel arbitration."

[4] We disregard the documents included in "Attachment A" to the amici curiae brief filed in support of State's position, and arguments based on those documents, because those documents are not part of the record on appeal. Each group of amici curiae has also submitted a brief responding to the other's amici curiae brief. We deny the respective motions of each amici curiae group to strike the other's response brief and exercise our discretion to accept and review those briefs. We also accept and review each party's brief filed in reply to the amici curiae brief supporting the other party's position. (*Santa Ana Unified School Dist. v. Orange County Development Agency* (2001) 90 Cal.App.4th 404, 412 [108 Cal.Rptr.2d 770].)

[5] All further statutory references are to the Code of Civil Procedure unless otherwise specified.

"[t]here is no public policy favoring arbitration of disputes which the parties have not agreed to arbitrate. [Citation.]" (*Engineers & Architects Assn. v. Community Development Dept.* (1994) 30 Cal.App.4th 644, 653 [35 Cal.Rptr.2d 800].) "The scope of arbitration is, of course, a matter of agreement between the parties . . . ." (*Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc. v. 100 Oak Street* (1983) 35 Cal.3d 312, 323 [197 Cal.Rptr. 581, 673 P.2d 251].) "In this state, as under federal law [citation], doubts concerning the scope of arbitrable issues are to be resolved in favor of arbitration. [Citations.] Therefore, in the absence of indication of contrary intent, and where the arbitration clause is reasonably susceptible of such an interpretation, claims . . . will be deemed subject to arbitration." (*Ibid.*, fn. omitted.)

██ "Private arbitration is a matter of agreement between the parties and is governed by contract law. [Citation.] Arbitration agreements are to be construed like other contracts to give effect to the intention of the parties. [Citation.]" (*Crowell v. Downey Community Hospital Foundation* (2002) 95 Cal.App.4th 730, 734 [115 Cal.Rptr.2d 810].) "When deciding whether the parties agreed to arbitrate a certain matter . . . , courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." (*First Options of Chicago, Inc. v. Kaplan* (1995) 514 U.S. 938, 944 [131 L.Ed.2d 985, 115 S.Ct. 1920].) "Ordinary rules of contract interpretation apply to the arbitration clause. [Citations.]" (*Maggio v. Windward Capital Management Co.* (2000) 80 Cal.App.4th 1210, 1214–1215 [96 Cal.Rptr.2d 168], fn. omitted.) ██ "The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties. (Civ. Code, § 1636.) If contractual language is clear and explicit, it governs. (Civ. Code, § 1638.)" (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264 [10 Cal.Rptr.2d 538, 833 P.2d 545].) "The court should attempt to give effect to the parties' intentions, in light of the usual and ordinary meaning of the contractual language and the circumstances under which the agreement was made [citations]." (*Weeks v. Crow* (1980) 113 Cal.App.3d 350, 353 [169 Cal.Rptr. 830].) ██ "[I]n applying general state-law principles of contract interpretation to the interpretation of an arbitration agreement within the scope of the [Federal Arbitration Act (9 U.S.C. §§ 1–16)], [citation], due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration." (*Volt Info. Sciences v. Leland Stanford Jr. U.* (1989) 489 U.S. 468, 475–476 [103 L.Ed.2d 488, 109 S.Ct. 1248].)

██ "The right to arbitration depends upon contract; a petition to compel arbitration is simply a suit in equity seeking specific performance of that contract. [Citations.]" (*Engineers & Architects Assn. v. Community Development Dept.*, *supra*, 30 Cal.App.4th at p. 653.) Section 1281.2 provides: "On petition of a party to an arbitration agreement alleging the

existence of a written agreement to arbitrate a controversy and that a party thereto refuses to arbitrate such controversy, the court shall order the petitioner and the respondent to arbitrate the controversy *if it determines that an agreement to arbitrate the controversy exists . . . .*" (Italics added.)
■ "In ruling on a petition to compel arbitration, the trial court may consider evidence on factual issues relating to the threshold issue of arbitrability, i.e., whether under the facts before the court, the contract excludes the dispute from its arbitration clause or includes the issue within that clause. [Citations.]" (*Engineers & Architects Assn., supra,* 30 Cal.App.4th at p. 653.)

■ HOP asserts, and State apparently concedes, when there is no conflicting extrinsic evidence we apply a de novo, or independent, standard of review on appeal from a trial court's determination of the issue of whether an arbitration agreement applies to a particular controversy. (*Fitz v. NCR Corp.* (2004) 118 Cal.App.4th 702, 711 [13 Cal.Rptr.3d 88]; *Abramson v. Juniper Networks, Inc.* (2004) 115 Cal.App.4th 638, 650 [9 Cal.Rptr.3d 422]; *Amalgamated Transit Union Local 1277 v. Los Angeles County Metropolitan Transportation Authority* (2003) 107 Cal.App.4th 673, 685 [132 Cal.Rptr.2d 207]; *CPI Builders, Inc. v. Impco Technologies, Inc.* (2001) 94 Cal.App.4th 1167, 1171–1172 [114 Cal.Rptr.2d 851]; *NORCAL Mutual Ins. Co. v. Newton* (2000) 84 Cal.App.4th 64, 71 [100 Cal.Rptr.2d 683]; *Marcus & Millichap Real Estate Investment Brokerage Co. v. Hock Investment Co.* (1998) 68 Cal.App.4th 83, 89 [80 Cal.Rptr.2d 147] ["Since the extrinsic evidence in this case consists entirely of written declarations, we review this issue de novo."]; *Brookwood v. Bank of America* (1996) 45 Cal.App.4th 1667, 1670 [53 Cal.Rptr.2d 515] ["Whether an arbitration agreement applies to a controversy is a question of law to which the appellate court applies its independent judgment where no conflicting extrinsic evidence in aid of interpretation was introduced in the trial court."]; *Vianna v. Doctors' Management Co.* (1994) 27 Cal.App.4th 1186, 1189 [33 Cal.Rptr.2d 188].) When "there is no evidence extrinsic to the contract or no conflict in the extrinsic evidence or the conflicting evidence is entirely written, a reviewing court is not bound by the finding of the trial court, but instead subjects the contract to independent review. [Citation.]" (*Patterson v. ITT Consumer Financial Corp.* (1993) 14 Cal.App.4th 1659, 1663 [18 Cal.Rptr.2d 563].)

II

*Interpretation of the MSA's Arbitration Clause*

HOP contends the trial court erred by concluding the plain language of the MSA's arbitration clause did not require arbitration of the claims asserted by State in the Application. HOP argues the MSA's arbitration clause clearly requires arbitration of those claims or, if not, it is at least ambiguous, requiring an interpretation favoring arbitration.

## A

■ To determine whether a contractual arbitration clause requires arbitration of a particular controversy, the controversy is first identified and the issue is whether that controversy is within the scope of the contractual arbitration clause.

State alleges in the Application that HOP has not reported Riga's annual cigarette sales, as required by the MSA, and seeks an enforcement order directing HOP to: (1) treat all cigarettes manufactured by Riga and sold in the United States as subject to the MSA's restrictions on marketing activities; (2) provide an accounting of all cigarettes manufactured by Riga and sold in the United States; and (3) pay all amounts HOP should have but has not paid pursuant to the terms of the MSA, because it did not report to the Auditor cigarettes manufactured by Riga and sold in the United States. The crux of State's case is whether the MSA applies to Riga's tobacco product sales through section VII(e) of the MSA, which provides that the MSA applies to HOP "in [its] corporate capacity acting through [its] respective successors and assigns, directors, officers, employees, agents, subsidiaries, divisions, or other internal organizational units of any kind or any other entities acting in concert or participation with [it]." State's entitlement to the relief requested in the Application is dependent on a favorable determination of that question. Therefore, the *controversy* raised in the Application is the interpretation of section VII(e) of the MSA and its application to HOP in the context of Riga's tobacco product sales.

■ The issue in this appeal is whether that controversy is within the scope of the MSA's arbitration clause. Section XI(c) of the MSA provides for arbitration of certain controversies: "Resolution of Disputes. *Any dispute, controversy or claim arising out of or relating to calculations performed by, or any determinations made by, [Auditor]* (including, without limitation, any dispute concerning the operation or application of any of the adjustments, reductions, offsets, carry-forwards and allocations described in subsection IX(j) or subsection XI(i)) *shall be submitted to binding arbitration . . . .*" (Italics added.) In interpreting section XI(c) of the MSA, it is considered in the context of all of the other provisions of the MSA. "The whole of a contract is to be taken together, . . . each clause helping to interpret the other." (Civ. Code, § 1641.) Language in an agreement "must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract." (*Producers Dairy Delivery Co. v. Sentry Ins. Co.* (1986) 41 Cal.3d 903, 916, fn. 7 [226 Cal.Rptr. 558, 718 P.2d 920].) Furthermore, contractual language is interpreted in its popular and ordinary sense unless the parties expressed a contrary intent. (Civ. Code, § 1644.) "Courts will not adopt a strained or absurd interpretation in order to

create an ambiguity where none exists." (*Reserve Insurance Co. v. Pisciotta* (1982) 30 Cal.3d 800, 807 [180 Cal.Rptr. 628, 640 P.2d 764].)

Section VII of the MSA deals with enforcement of the parties' obligations under the MSA and the resulting consent decrees. Section VII(a)(2) provides the trial court "shall retain *exclusive jurisdiction* for the purposes of implementing and *enforcing* [the MSA]." (Italics added.) Section VII(a)(3) further provides the trial court "shall be the only court to which disputes under [the MSA] . . . are presented as to [State]," except as provided in section XI(c) and certain other specific provisions. Section VII(c)(1) provides a general rule that disputes regarding the MSA may be resolved by actions filed in the trial court: "Except as provided in [section XI(c)], *any Settling State* [e.g., State] or [OPM or SPM] *may bring an action in the Court* [e.g., the trial court in this case] *to enforce the terms of [the MSA] (or for a declaration construing any such term* ('Declaratory Order')) with respect to disputes, alleged violations or alleged breaches within such Settling State [e.g., State]." (Italics added.) The MSA provides a general rule that all disputes relating to the MSA, including disputes regarding the proper interpretation of the MSA's terms and provisions, are to be resolved through actions filed in the trial court. Accordingly, the controversy of whether HOP's obligations under the MSA apply to Riga's tobacco product sales may be resolved through an action filed by State in the trial court, *unless* another provision (i.e., section XI(c)) provides otherwise.

Under the MSA, Auditor is charged with calculating and determining the amount of annual payments HOP owes under the MSA and the allocation of the aggregate annual payments made by the OPM's and SPM's (including HOP's payments) among the Settling States. Auditor's duties under the MSA consist of *collecting* information from the OPM's, SPM's and Settling States and, *based on that information*, calculating and determining payments owed by HOP (and the OPM's and other SPM's) under the MSA and payments allocated to State (and the other Settling States) from the aggregate payments received from the OPM's and SPM's.

The controversy raised by the Application is the interpretation of section VII(e), which provides that the MSA is applicable to "the [OPM's and SPM's] in their corporate capacit[ies] acting through their respective successors and assigns, directors, officers, employees, agents, subsidiaries, divisions, or other internal organizational units of any kind or any other entities acting in concert or participation with them." Section VII(e) in the circumstances of this case does *not* involve the calculations and determinations that have been made by Auditor pursuant to section XI and the other provisions of the MSA. Rather, interpretation of section VII(e) involves the question of whether HOP is responsible for tobacco products manufactured by Riga and sold in the

United States.[6] Therefore, independently construing section XI(c) in the context of the MSA as a whole and in the circumstances of this case, we conclude the plain meaning of section XI(c) does *not* require arbitration of the controversy raised by the Application. (Civ. Code, § 1641; *Producers Dairy Delivery Co. v. Sentry Ins. Co.*, *supra*, 41 Cal.3d at p. 916, fn. 7.) Because the MSA's language is clear and explicit that arbitration of the instant controversy is not required, that language governs and State properly sought resolution of the controversy by filing the Application in the trial court. (Civ. Code, § 1638; *Bank of the West v. Superior Court*, *supra*, 2 Cal.4th at p. 1264.) Accordingly, the trial court properly denied HOP's motion to compel arbitration.

### B

Although HOP presents several arguments in support of its position that the controversy raised by the Application is subject to the MSA's arbitration clause, those arguments are not persuasive.

HOP argues arbitration of the Application's controversy is required because section XI(c) of the MSA requires arbitration of "[a]ny dispute, controversy or claim arising out of or relating to calculations performed by, or any determinations made by, [Auditor]." HOP reasons that because the enforcement order sought by the Application could result in different calculations being made by Auditor regarding the amount of annual payments owed, or to be owed, by HOP, the Application's controversy necessarily arises out of or relates to Auditor's calculations or determinations. However, the Application does not challenge any calculation or determination *made by Auditor*. Rather, it challenges *HOP's decision* to exclude Riga's tobacco product sales from HOP's obligations under the MSA, including the MSA's marketing restrictions and HOP's obligation to provide annual sales reports to Auditor. The Application expressly alleges HOP and Riga "acted in concert and participation with" one another within the meaning of section VII(e) of the MSA, thereby making the MSA's obligations applicable to Riga's tobacco product sales. That is the controversy raised by the Application. After that controversy is resolved, the relief sought by the Application simply involves either enforcement or nonenforcement of the MSA's obligations as to Riga's tobacco product sales. If that controversy is resolved favorably to State, the Application seeks issuance of an enforcement order directing HOP to:

---

[6] In comparison, section XI(c) describes the types of calculations and determinations Auditor is to make under the MSA as "including, without limitation, any dispute concerning the operation or application of any of the adjustments, reductions, offsets, carry-forwards and allocations described in subsection IX(j) or subsection XI(i)." Those types of calculations and determinations appear to involve accounting matters and are not the type of complex mixed legal and factual determinations commonly decided by courts of law.

(1) treat all Riga's tobacco product sales as subject to the MSA's marketing restrictions; and (2) provide an accounting of those sales and pay amounts it should have but has not paid under the MSA. HOP argues that if the latter relief were awarded, it necessarily would "relate to" calculations or determinations made by Auditor. However, in so arguing, HOP puts the cart before the horse. The Application does not challenge any calculation or determination that *has been made* by Auditor. Rather, the controversy raised by and the relief requested in the Application "relate to" HOP's decision not to include Riga's tobacco product sales within its MSA obligations. Any relief ordered pursuant to the Application will, at most, result in *future* calculations or determinations being made by Auditor regarding HOP's payment obligations under the MSA. Section XI(c)'s language does not require arbitration of the controversy raised by the Application.[7]

HOP also argues because section VII of the MSA allows the trial court to decide only those disputes arising within California, the controversy raised by the Application necessarily is subject to arbitration under the MSA. However, section VII(a) provides the trial court "shall retain exclusive jurisdiction for the purposes of implementing and enforcing [the MSA] and the Consent Decree as to [State]" and "shall be the only court to which disputes under [the MSA] or the Consent Decree are presented as to [State]." Section VII(c)(3) provides that if the trial court finds HOP (or an OPM or another SPM) has violated or breached the MSA, State "may request an order restraining such violation or breach, and/or ordering compliance within [State] (an 'Enforcement Order')." HOP argues because under the MSA the trial court is restricted to resolving disputes under, and enforcing, the MSA "as to" State and issuing orders for compliance only "within" State, the trial court cannot address any issues involving the MSA's "unitary" (HOP's suggested adjective) system for payments by OPM's and SPM's, which necessarily involves only one annual payment by HOP for all of its United States tobacco product sales.

Assuming arguendo the MSA involves a "unitary" payment system, section VII of the MSA nevertheless provides for court actions in each Settling State for alleged violations or breaches of the MSA. In the circumstances of this case, the Application alleges HOP has treated Riga's tobacco product sales as outside the MSA's provisions and thereby has avoided the MSA's marketing restrictions and annual sales reporting obligations as to Riga's tobacco product sales. HOP apparently concedes the MSA allows State to bring an action against HOP in the trial court to enforce the MSA's marketing restrictions as to HOP's (potentially including, as alleged in the Application,

---

[7] Of course, any challenge of those future calculations or determinations, when made by Auditor, presumably will then be subject to section XI(c)'s arbitration requirement.

Riga's) operations and sales in California.[8] Therefore, HOP's assertion that State cannot bring an action against HOP in the trial court to enforce other provisions of the MSA is inconsistent with section VII's general rule that State may bring an action against HOP in the trial court for an order of compliance with the MSA.

If HOP chooses to exclude sales of its subsidiaries or other affiliates from the MSA's provisions (whether regarding marketing restrictions, reporting obligations, or otherwise), section VII of the MSA authorizes State to bring an action to enforce the MSA's provisions.[9] Although section VII(c) restricts those enforcement actions to "disputes, alleged violations or alleged breaches within [State]," HOP does not show, as a matter of law, the allegations in the Application do not involve such a dispute or alleged violation or breach of the MSA within California. Instead, HOP argues the Application alleges violations or breaches of the MSA that affect all the Settling States, including State, and therefore cannot be the subject of an enforcement action in a California court. Assuming arguendo the Application's allegations include violations affecting not only HOP's actions within California but also within other Settling States, we conclude it is a matter for the trial court in this case to consider in the first instance whether or how it should limit the issues and any relief granted to State pursuant to the Application. We cannot presume the trial court will order any relief that may be beyond its jurisdiction or authority.

HOP also argues State does not have a direct claim against HOP for any underpayments due State resulting from Riga's alleged cigarette sales, because State must obtain payments due it under the MSA through the agent that receives the annual payments from the OPM's and SPM's, which payments are based on calculations made by Auditor. Because the Application alleges State has not received over $7 million from HOP because of HOP's exclusion of Riga's tobacco product sales, HOP argues State's claims and requests for relief cannot be considered by the trial court, but must be arbitrated because only Auditor can make those payment determinations. Again, HOP misconstrues the MSA and places the cart before the horse. State

[8] Absent an express provision in the MSA to the contrary, it would contradict section VII's general rule, and would also be illogical, to hold Riga's cigarette sales are subject to the MSA for purposes of its marketing restrictions but not for purposes of HOP's reporting obligations.

[9] Section VII(c)(1) sets forth the only specific exceptions to section VII's general provisions authorizing court actions: "Except as provided in subsections IX(d), XI(c), XVI(d) and Exhibit O, any Settling State or [OPM or SPM] may bring an action in the Court to enforce the terms of this Agreement . . . ." The only specific exception to court enforcement on which HOP relies in this case is section XI(c), which, in the context of the entire MSA and the circumstances of this case, does not require arbitration or otherwise provide an exclusion to section VII's general rule that State may bring enforcement actions in the trial court for violations of the MSA's provisions.

does not dispute any calculation or determination *that has been made by Auditor*, but challenges HOP's unilateral decision to exclude Riga's tobacco product sales from HOP's obligations under the MSA.

HOP also argues the controversy raised by the Application must be arbitrated because section XI(d)(3) of the MSA allows State or HOP to dispute "any aspect of [Auditor's] Preliminary Calculations (including, but not limited to, disputing the methodology that [Auditor] employed, or *the information on which [Auditor] relied*, in preparing such calculations) . . . ." (Italics added.) However, to the extent that provision allows disputes regarding the information on which Auditor relied in making its payment calculations to be arbitrated under section XI(c), the controversy raised by the Application is not subject to arbitration because Auditor could not, and *did not*, rely on information regarding Riga's tobacco product sales in making its calculations; HOP omitted those sales from its annual sales reports. HOP also cites section XI(a)(1), which provides: "[Auditor] shall promptly collect all information necessary to make such calculations and determinations. [HOP and State] shall provide [Auditor], as promptly as practicable, with information in its possession or readily available to it necessary for [Auditor] to perform such calculations." HOP argues because *State* had an obligation to provide Auditor with information regarding Riga's tobacco product sales that State alleges was necessary for Auditor's payment calculations, yet State did not provide that information to Auditor, the instant dispute must be arbitrated. Assuming arguendo State possessed information it could have but did not provide to Auditor regarding Riga's tobacco product sales, HOP does not cite any provision in the MSA that requires arbitration of the dispute or otherwise penalizes State based on its failure to provide Auditor with that information. Furthermore, in so arguing, HOP apparently attempts to divert attention from its own alleged failure to provide information to Auditor. Based on the Application's allegations, it can be presumed information regarding Riga's tobacco product sales was more fully and directly available to HOP than to State.

■ HOP also argues because there are strong presumptions in favor of arbitration under California law and the Federal Arbitration Act, the controversy raised by the Application must be arbitrated. "In this state, as under federal law [citation], doubts concerning the scope of arbitrable issues are to be resolved in favor of arbitration. [Citations.] Therefore, in the absence of indication of contrary intent, and where the arbitration clause is reasonably susceptible of such an interpretation, claims . . . will be deemed subject to arbitration." (*Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc. v. 100 Oak Street, supra*, 35 Cal.3d at p. 323, fn. omitted.) "[I]n applying general state-law principles of contract interpretation to the interpretation of an arbitration agreement within the scope of the [Federal Arbitration Act], [citation], due regard must be given to the federal policy favoring arbitration,

and ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration." (*Volt Info. Sciences v. Leland Stanford Jr. U.*, *supra*, 489 U.S. at pp. 475–476.) However, those presumptions in favor of arbitration do not apply if contractual language is plain that arbitration of a particular controversy is not within the scope of the arbitration provision. "There is no public policy favoring arbitration of disputes which the parties have not agreed to arbitrate. [Citation.]" (*Engineers & Architects Assn. v. Community Development Dept.*, *supra*, 30 Cal.App.4th at p. 653.) "The purpose of the Federal Arbitration Act 'was to make arbitration agreements as enforceable as other contracts, *but not more so.*'" (*McDonnell Douglas Finance v. Pa. Power & Light Co.* (2d Cir. 1988) 858 F.2d 825, 831, quoting *Prima Paint v. Flood & Conklin* (1967) 388 U.S. 395, 404, fn. 12 [18 L.Ed.2d 1270, 87 S.Ct. 1801], italics added by *McDonnell Douglas.*) Because section XI(c) in the context of the entire MSA is not reasonably susceptible to an interpretation *that arbitration of the instant controversy is required*, the state and federal presumptions favoring arbitration do not apply.[10]

HOP also cites two items of extrinsic evidence as support for its position that the Application's claims are subject to arbitration under section XI(c). One item was Loveland's letter to HOP dated September 8, 1999, in which she stated: "With regard to the application of the [MSA] to [Peter Stokkebye International A/S and HOP], [Auditor] will decide whether—or the extent to which—sales of particular brands of Tobacco Products will be included within those companies' Market Share under the MSA. If there is a dispute about that determination, the dispute will be resolved in arbitration pursuant to MSA § XI(c)." The other item of extrinsic evidence was Loveland's memorandum to the MSA technical working group dated February 1, 2000, in which she stated: "This 'default' [i.e., market share as measured by excise taxes paid] is not to be dispositive at any point in the process, and any party may challenge who is the 'manufacturer' with respect to particular Cigarettes—both to [Auditor] and in any later arbitration proceeding arising from [Auditor's] Final calculation." Even were we to provisionally consider those two items of extrinsic evidence, we nevertheless would conclude they are ultimately irrelevant and inadmissible on the issue of whether the Application's claims are subject to arbitration under the MSA because the MSA's provisions are *not* reasonably susceptible to an interpretation that arbitration

---

[10] Because the state and federal presumptions are inapplicable, we need not address HOP's further argument that those presumptions are stronger if the arbitration clause is a "broad" provision. Furthermore, although HOP attempts to apply to this case the "positive assurance" requirement discussed in *AT&T Technologies v. Communications Workers* (1986) 475 U.S. 643, 650 [89 L.Ed.2d 648, 106 S.Ct. 1415], State correctly notes the United States Supreme Court has limited the application of that requirement to collective bargaining cases. (*Wright v. Universal Maritime Service Corp.* (1998) 525 U.S. 70, 78 [142 L.Ed.2d 361, 119 S.Ct. 391].) Accordingly, that requirement is inapplicable to this case.

of those claims under Section XI(a) is required.[11] (*In re Marriage of Iberti* (1997) 55 Cal.App.4th 1434, 1439–1440 [64 Cal.Rptr.2d 766]; *Curry v. Moody* (1995) 40 Cal.App.4th 1547, 1552 [48 Cal.Rptr.2d 627]; *Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165–1166 [6 Cal.Rptr.2d 554].)

HOP also argues there is a possibility of conflicting court rulings if the controversy raised by the Application is not arbitrated. Assuming arguendo conflicting court rulings are possible on the issue of whether HOP's obligations under the MSA apply to Riga's tobacco product sales, that possibility does not compel arbitration of the Application's controversy. In fact, section VII(c) of the MSA essentially contemplates possible conflicting court rulings by providing for enforcement of the MSA in a separately designated court for each of the 52 Settling States.[12] For instance, enforcement of the MSA's marketing restrictions can be sought in a California court, as well as in courts in the other 51 Settling States, and the possibility of conflicting interpretations of the MSA's marketing restrictions does not require arbitration of disputes regarding those restrictions. The possibility of conflicting court rulings is an inherent consequence of our decentralized political and judicial systems. Also, absent express provisions requiring arbitration (which do not exist in this case), there is no compelling reason under the MSA or otherwise to limit the various courts' authority to interpret the MSA when the impact of that interpretation may affect HOP's (or another OPM's or SPM's) obligation to report tobacco product sales under the MSA, which in turn may affect the amounts of its annual payments. Furthermore, in contemplation of possible conflicting court rulings, section VII(f) of the MSA provides: "Coordination of Enforcement. The Attorneys General of the Settling States (through NAAG) shall monitor potential conflicting interpretations by courts of different States of this Agreement and the Consent Decrees. The Settling States shall use their best efforts, in cooperation with the [OPM's and SPM's], to coordinate and resolve the effects of such conflicting interpretations as to matters that are not exclusively local in nature." The MSA not only recognizes the possibility of conflicting court interpretations of the MSA, but also provides for coordination among the Settling States' Attorneys General to minimize conflicts and their effects.

---

[11] In any event, because both of those writings of an attorney (who, according to Weis, represented some or all of the Settling States) were dated *after* the effective date of the MSA, their persuasive effect regarding the parties' intent as expressed in the MSA is minimal and, in light of plain language to the contrary, do not show the MSA is ambiguous regarding arbitration of the instant controversy.

[12] The Settling States include 46 states of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and four territories of the United States.

## DISPOSITION

The order is affirmed. State is entitled to costs on appeal.

McConnell, P. J., and Haller, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 23, 2005.