Filed 2/19/14  Foster v. Train, Babcock Advisors CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| DELIA W. FOSTER et al.,<br><br>    Plaintiffs and Respondents,<br><br>v.<br><br>TRAIN, BABCOCK ADVISORS LLC et al.,<br><br>    Defendants and Appellants. | A139304<br><br>(San Francisco County<br>  Super. Ct. No. PES 13-296-527) |
| DELIA W. FOSTER et al.,<br><br>    Plaintiffs and Respondents,<br>v.<br><br>TRAIN, BABCOCK ADVISORS LLC,<br><br>    Defendant and Appellant. | A139325<br><br>(San Francisco County<br>  Super. Ct. Nos. PTR 13-296 471,<br>  PTR 13-296 472, PTR 13-296 473) |

In these consolidated cases, defendants Train Babcock Advisors, LLC and John H. Rogicki appeal from four orders denying their petitions to compel arbitration of claims brought against them by plaintiffs Delia W. Foster, Michelle Woodhouse, and Barry S. Woodhouse, individually and as guardian ad litem for Stephen J. Woodhouse.  Because plaintiffs have not agreed to arbitrate their claims, we affirm the orders denying defendants' requests to compel arbitration.

1

# FACTS[1]

## A. Background[2]

In the mid-1990s, Delia W. Foster hired Train, Babcock Advisors, LLC (TBA), a registered investment adviser, to advise her on securities investments and to manage her portfolio of investment securities. Brian Keenan, a TBA chief executive officer and adviser, was assigned as the "client relationship manager" to specifically handle Foster's account.

In the ensuing years Foster also developed a personal relationship with Keenan and John Rogicki, TBA's chief executive officer and managing director, each of whom assumed an increasing role in Foster's family and other financial matters. At Keenan's suggestion, he and Rogicki were named as executors of Foster's will, and Keenan was named Foster's agent for health care decisions. Also, Keenan and Rogicki became trustee and substitute trustee, respectively, of Foster's living trust. On February 10, 2011, Foster signed an uniform statutory form (Prob. Code, § 4401), appointing Keenan her agent with general powers of attorney to act in all manner of transactions. By accepting and acting under the appointment, Keenan assumed the fiduciary and other legal responsibilities of an agent. The form does not contain a provision for the arbitration of disputes.

At the suggestion of Keenan, Foster created an irrevocable trust for her nephew Barry S. Woodhouse in 2005, and created similar irrevocable trusts for her nephew's

---

[1]  Plaintiffs ask us to take judicial notice of certain SEC forms and other documents relating to investment advisers, which request is opposed by defendants. "We deny the request for judicial notice because the materials in question are either irrelevant or unnecessary to our resolution of the issues raised on appeal." (*Coastside Fishing Club v. California Fish and Game Com.* (2013) 215 Cal.App.4th 397, 429.)

[2]  For the purposes of resolving this appeal, we set forth the facts as alleged in plaintiffs' petitions. However, our recitation should not be read and we express no opinion on whether the allegations sufficiently support plaintiffs' requests for relief against defendants. "[I]n deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims." (*AT&T Technologies v. Communications Workers of America et al.* (1986) 475 U.S. 643, 649 (*AT&T Technologies*).)

children Michelle Woodhouse and Stephen J. Woodhouse in 2010 (hereinafter collectively referred to as the trusts). Because of her confidence in Keenan, Foster named him as the sole trustee of each trust and named Rogicki as successor trustee; Foster's lawyer, Gary E. Botto, was also named as a successor trustee. The trust agreements include provisions that they are to be construed in accordance with California law. The trust agreements contain no provisions for the arbitration of disputes.

Keenan, as Foster's TBA investment adviser, deposited and held her entire securities portfolio in a brokerage account at Charles Schwab & Co, Inc. Keenan encouraged and convinced Foster to make gifts to the trusts created for her nephew and his children. The gifts were funded by monetary transfers from Foster's Schwab account to new Schwab accounts that Keenan established in his role as trustee of each trust. After the creation of the first trust, Keenan as trustee signed an "Investment Advisory Agreement" (IAA), with Keenan as Client and TBA as "Advisor." Additionally, in 2008, 2009, and 2012, Keenan had Foster sign IAAs, with Foster as Client and TBA as "Advisor," or "Adviser." The pertinent terms of each agreement are essentially identical. The "Scope of Engagement" is defined as follows:

(a) **CLIENT** hereby appoints **ADVISER** as an Investment Adviser to perform the services hereinafter described, and **ADVISER** accepts such appointment. **ADVISER** shall be responsible for the investment and reinvestment of those assets designated by **CLIENT** to be subject to **ADVISER**'s management (which assets, together with all additions, substitutions, and/or alterations thereto are hereinafter referred to as the "**Assets"** or "**Account"**);

(b) **CLIENT** delegates to **ADVISER** all of its powers with regard to the investment and reinvestment of the Assets and appoints **ADVISER** as **CLIENT**'s attorney and agent in fact with full authority to buy, sell, or otherwise effect investment transactions involving the **Assets** in **CLIENT**'s name for the **Account**;

(c) **ADVISER** is authorized, without prior consultation with **CLIENT**, to buy, sell, trade and allocate in and among stocks, bonds, mutual funds, sub-

3

advisers, independent investment managers and/or programs (with or without discretion, depending upon the independent investment manager or program) and other securities and/or contracts relating to the same, on margin (only if written authorization has been granted) or otherwise, and to give instructions in furtherance of such authority to the registered broker-dealer and the custodian of the **Assets**;

(d) **ADVISER** shall discharge its investment management responsibilities, consistent with the **CLIENT**'s designated investment objectives. Unless the **CLIENT** has advised the **ADVISER** to the contrary, in writing, there are no restrictions that the **CLIENT** has imposed upon the **ADVISER** with respect to the management of the **Assets**. . . . [¶] . . . [¶]

(g) The **CLIENT** acknowledges and understands that the services to be provided by **ADVISER** under this **Agreement** are limited to the management of the Assets and **do not** include financial planning or any other related or unrelated consulting services. (Emphasis in original.)

Each IAA also includes the following arbitration clause:

15. <u>Arbitration</u>. Subject to the conditions and exceptions noted below and to the extent not inconsistent with applicable law, in the event of any dispute pertaining to **ADVISER**'s services under this **Agreement** that cannot be resolved by mediation, both **ADVISER** and **CLIENT** agree to submit the dispute to arbitration in accordance with the auspices and rules of the American Arbitration Association ("AAA"), provided that the AAA accepts jurisdiction**. ADVISER and CLIENT understand that such arbitration shall be final and binding, and that by agreeing to arbitration both ADVISER and CLIENT are waiving their respective rights to seek remedies in court, including the right to a jury trial. CLIENT** acknowledges that Client has had a reasonable opportunity to review and

4

consider this arbitration provision prior to the execution of this **Agreement**. **CLIENT** acknowledges and agrees that in the specific event of non-payment of any portion of *Adviser Compensation* pursuant to paragraph 2 of this **Agreement**, **ADVISER**, in addition to the aforementioned arbitration remedy, shall be free to pursue all other legal remedies available to it under law, and shall be entitled to reimbursement of reasonable attorneys fees and other costs of collection." (Emphasis in original.) [3]

In July 2012, Foster received a letter from TBA signed by Keenan asking her to authorize transfers from her Schwab account to the trusts, totaling $600,000 ($200,000 for each trust). Foster signed the authorizations as she had many times in the past. However, in August 2012, Foster received another letter from TBA signed by Keenan asking her to authorize similar transfers from her Schwab account to the trusts, totaling $800,000. Foster became concerned because Keenan's latest requests appeared to be duplications. Foster and her counsel unsuccessfully attempted to contact Keenan. Foster's counsel ultimately received a letter from TBA signed by Rogicki stating that Keenan was no longer working at TBA.

On October 18, 2012, Foster sent a letter to Keenan informing him of the revocation of the general power of attorney that had been granted in 2011. On February 1, 2013, Foster sent a letter to Rogicki informing him that she "terminates the engagement of [TBA] for securities investment advisory and management services."

B.      Plaintiffs' Petitions

On February 8, 2013, Foster, Barry S. Woodhouse, individually and as guardian ad litem for Stephen J. Woodhouse, and Michelle Woodhouse, filed three separate

---

[3]     Paragraph 2, referenced in the arbitration clause, sets forth the principles and formulae by which the adviser's compensation is to be determined and paid. Each IAA also contains an applicable law and venue provision, which reads: "To the extent not inconsistent with applicable law, this **Agreement** shall be governed by and construed in accordance with the laws of" New York, and "the venue (i.e. location) for the resolution of any dispute or controversy between **ADVISER** and **CLIENT**" shall be New York City, New York. (Emphasis in original.)

petitions seeking relief under the Probate Code to (1) remove Keenan and Rogicki, as trustee and successive trustee, respectively, (2) compel Keenan as trustee and TBA as Keenan's principal to account and report for the trust assets, and (3) surcharge Keenan as trustee and TBA as Keenan's principal for any inappropriate or unaccounted for disbursements or other losses of the trusts' property.  In pertinent part, plaintiffs alleged that transfers of funds (about $1.850 million) had been traced from Foster's Schwab account to the trusts' Schwab accounts, and then out of the trusts' accounts but not into the personal bank accounts of the trust beneficiaries.

In addition, on February 26, 2013, Foster filed a separate petition seeking to (1) terminate Keenan's general power of attorney granted on February 10, 2011, and any power of attorney that might have been granted to TBA and Rogicki, (2) compel Keenan, TBA, and Rogicki to account and report all transactions to determine surcharges for bad faith conduct as attorneys-in-fact under Probate Code section 4231.5, and (3) compel Keenan, TBA, and Rogicki to return Foster's property.  In pertinent part, Foster alleged that "Keenan, individually and on behalf of [TBA], continually and systematically ingratiated himself with [her].  The trust and confidence [she] reposed in Keenan and [TBA] permitted Keenan to invite himself and Rogicki to be appointed as executors, trustees and agents by and for [her] in several capacities and eventually place himself, Rogicki and [TBA] in a position of complete power and authority over [her] property interests with little prospect of independent oversight."  "[T]hrough Keenan's status as [her] attorney-in-fact and the other fiduciary capacities granted to Keenan, Rogicki and [TBA,]" Foster alleged that "approximately $2,000,000 of [her] property ha[d] been misappropriated."  It was further alleged that "the court should surcharge Keenan, Rogicki and [TBA] for any loss in value of [Foster's] property resulting from any breach of fiduciary duty, any profit resulting from any breach of the fiduciary duty and any profit that would have accrued to [Foster] if not for the breach of fiduciary duty.  [If] . . . Keenan, Rogicki and [TBA] [are] found to have [acted] in bad faith[,] wrongfully taken, concealed or disposed of [Foster's] property, [they] should be charged with twice the value of the property wrongfully taken, concealed or disposed of."

6

### C. Defendants' Petitions to Compel Arbitration

Before filing answers, TBA and Rogicki filed separate petitions to compel arbitration, pursuant to the IAAs signed by Foster, which requests were opposed by plaintiffs. After a hearing, the court issued separate orders denying the petitions to compel arbitration in the four cases. These timely appeals ensued.

### DISCUSSION[4]

The sole dispute here is whether plaintiffs' allegations in their petitions fall within the scope of the arbitration clause in the IAAs. "Where as here, the evidence is not in conflict, we review the trial court's denial of arbitration de novo." (*Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 236 (*Pinnacle Museum Tower Assn.*) If the allegations are covered by the arbitration clause, then the orders should be reversed and the parties directed to arbitrate their disputes. Otherwise, the orders should affirmed. As we now discuss, we conclude the IAAs' arbitration clause cannot be read in the fashion argued by defendants as mandating that the parties submit to arbitration "any dispute arising out of or relating to" the IAAs. Instead, we agree with plaintiffs that the arbitration clause is limited to disputes concerning the performance of the adviser's services as described in the IAAs. Because plaintiffs do not allege claims within the scope of defendants' performance as advisers of the services set forth in the IAAs, we concur with the trial court's denial of the petitions to compel arbitration.

Defendants note at the outset of their argument that public policy favors enforcement of arbitration clauses. (See *Allied-Bruce Terminix Cos. v. Dobson* (1995) 513 U.S. 265, 270-271; *Pinnacle Museum Tower Assn., supra,* 55 Cal.4th at p. 235; *TNS Holdings, Inc. v. MKI Sec. Corp*. (1998) 92 N.Y.2d 335, 339 (*TNS Holdings*).) However,

---

[4] Defendants do not ask us to determine whether federal substantive law, New York law or California law should be applied to the arbitrability issue in this case, arguing that all material aspects of those laws are the same. Because we agree with defendants that the arbitrability issue would be decided the same under federal substantive law, and the laws of New York and California, we shall resolve the issue using those laws as pertinent in our analysis.

defendants also acknowledge, as they must, that there is no public policy "compelling persons to accept arbitration of controversies which they have not agreed to arbitrate . . . ." (*Freeman v. State Farm Mut. Auto Ins. Co.* (1975) 14 Cal. 3d 473, 481; see *Prima Paint Corp. v. Flood & Conklin Mfg. Co.* (1967) 388 U.S. 395, 404 & fn. 12 [accord]; *TNS Holdings, supra*, 92 N.Y.2d at p. 339 [accord].) Thus, any state and federal presumptions "in favor of arbitration do not apply if contractual language is plain that arbitration of a particular controversy is not within the scope of the arbitration provision." (*In re Tobacco Cases I* (2004) 124 Cal.App.4th 1095, 1112; see *McDonnell Douglas Finance Corp. v. Pennsylvania Power & Light Co.* (2d Cir. 1988) 858 F.2d 825, 832 [accord].)

In determining whether a particular dispute falls within the scope of an agreement's arbitration clause, we "undertake a three-part inquiry. First, recognizing there is some range in the breadth of arbitration clauses, a court should classify the particular clause as either broad or narrow. [Citations.] Next, if reviewing a narrow clause, the court must determine whether the dispute is over an issue that 'is on its face within the purview of the clause,' or over a collateral issue that is somehow connected to the main agreement that contains the arbitration clause. [Citations.] Where the arbitration clause is narrow, a collateral matter will generally be ruled beyond its purview. [Citation.] Where the arbitration clause is broad, 'there arises a presumption of arbitrability' and arbitration of even a collateral matter will be ordered if the claim alleged 'implicates issues of contract construction or the parties' rights and obligations under it.' " (*Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.* (2d Cir. 2001) 252 F.3d 218, 224 (*Louis Dreyfus Negoce S.A.*).) Additionally, "[i]n determining the scope of an arbitration clause," we " 'attempt to give effect to the parties' intentions, in light of the usual and ordinary meaning of the contractual language and the circumstances under which the agreement was made [citation].' " (*Victoria v. Superior Court* (1985) 40 Cal.3d 734, 744, quoting from *Weeks v. Crow* (1980) 113 Cal.App.3d 350, 353.)

Defendants argue the IAAs' arbitration clause must be interpreted broadly because of the presence of "hallmark phrases," such as "any dispute" and "pertaining to," which is synonymous with "relating to." However, the so-called hallmark phrases of "any dispute" and "pertaining to" precede, and are explicitly limited by, the next, far more significant words of the clause, namely, "**ADVISER**'s services under this **Agreement**." (See *Bono v. David* (2007) 147 Cal.App.4th 1055, 1068 (*Bono*).) The IAAs enumerate an adviser's services as "the investment and reinvestment of those assets designated by **CLIENT** to be subject to **ADVISER**'s management," and expressly exclude "financial planning or any other related or unrelated consulting services." Thus, we conclude the only reasonable interpretation of the arbitration clause is that the parties intended to limit arbitration to disputes pertaining to the adviser's IAA services and not all disputes pertaining to the IAAs. (See *Louis Dreyfus Negoce S.A.*, *supra*, 252 F.3d at p. 226 [" '[s]pecific words or phrases alone may not be determinative although words of limitation would indicate a narrower clause' "]; *Bono, supra*, 147 Cal.App.4th at p. 1067 [mandatory arbitration clause "covers only, a controversy involving 'the construction and application of any provision of this Agreement;' " "[t]his is substantially narrower than . . . the clauses . . . which used terminology such as 'any controversy arising out of or relating to' and the like"]; *Medical Staff of Doctors Medical Center in Modesto v. Kamil* (2005) 132 Cal.App.4th 679, 682-683 [contract clause providing that "[i]n the event that any problem or dispute concerning the terms of this Agreement, other than a Utilization Review decision as provided for in Article VII, is not satisfactorily resolved, BLUE CROSS and PHYSICIAN agree to arbitrate such problem or dispute" is limited "to those disputes *concerning the terms of the agreement*"]; *In re Tobacco Cases I, supra*, 124 Cal.App.4th at pp. 1100, 1102, 1107-1108 [mandatory arbitration clause covering "*any dispute, controversy or claim arising out of or relating to calculations performed by, or any determinations made by, [Auditor]*," did not require arbitration of State's application seeking to compel opposing party to submit certain information to Auditor].) [5]

---

[5] In light of our determination that we are not here concerned with a broad

9

Because the IAAs' arbitration clause is "a narrow clause," the next question is "whether the dispute is over an issue that 'is on its face within the purview of the clause,' or over a collateral issue that is somehow connected to the main agreement that contains the arbitration clause." (*Louis Dreyfus Negoce S.A., supra,* 252 F.3d at p. 224.) Here, plaintiffs' petitions do not expressly raise complaints pertaining to the investment or reinvestment of Foster's funds in her Schwab account maintained by her TBA adviser, or otherwise assert that defendants breached fiduciary duties owed under the IAAs. Instead, the petitions filed by Foster and the trust beneficiaries seek relief based on Keenan's alleged tortious conduct "as trustee" of the trusts, and TBA's alleged tortious conduct as "Keenan's principal." The petition filed by Foster, individually, seeks relief based on Keenan's alleged breaches of fiduciary duties arising under the general power of attorney granted on February 10, 2011, and allegations that "Rogicki and [TBA] were aware of Keenan's misconduct and were acting in concert with Keenan." Because the IAAs are not the basis of plaintiffs' petitions, we conclude the arbitration clauses contained in the IAAs do not apply in these consolidated actions. (See *Elijahjuan v. Superior Court* (2012) 210 Cal.App.4th 15, 20; see also *Volt Info. Sciences v. Board of Trustees, Leland Stanford Jr. U.* (1989) 489 U.S. 468, 478; *TNS Holdings, supra*, 92 N.Y.2d at p. 339.)

---

arbitration clause, we need not further address defendants' arguments that any doubt about the breadth of the arbitration clause must be resolved in favor of arbitration, that "there is a presumption of arbitrability in the sense that '[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute,' " (*AT&T Technologies, supra*, 475 U.S. at p. 650), or that arbitration must be compelled because all of plaintiffs' allegations have "their roots in" the IAAs.

## DISPOSITION

The orders are affirmed.  Plaintiffs Delia W. Foster, Michelle Woodhouse, and Barry S. Woodhouse, individually and as guardian ad litem for Stephen J. Woodhouse, are awarded costs on appeal.

_____

Jenkins, J.

We concur:

_____

McGuiness, P. J.

_____

Siggins, J.