Filed 7/16/21  Friends of La Jolla Shores v. T.B. Penick & Sons CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| FRIENDS OF LA JOLLA SHORES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>T.B. PENICK & SONS, INC.,<br><br>Defendant and Appellant. | D078200<br><br><br>(Super. Ct. No. 37-2020-00019468-CU-BC-CTL) |

APPEAL from an order of the Superior Court of San Diego County, Timothy Taylor, Judge.  Affirmed.

Marks, Golia & Pinto, Robert J. Marks, Richard J. Pinto II and Sara E. Miller, for Defendant and Appellant.

Bryan M. Garrie for Plaintiff and Respondent.

## INTRODUCTION

Friends of La Jolla Shores (Friends) sued T.B. Penick & Sons, Inc. (Penick) for breach of contract and declaratory relief, alleging that Penick refused to perform under a settlement agreement that the parties entered in 2015 to settle Friends' earlier construction defect action against Penick.

Penick moved to compel arbitration, asserting that Friends' claims fell within the scope of the arbitration provision of the settlement agreement. The trial court denied that motion and Penick appeals. In our de novo review, we agree with the trial court that the parties do not have an existing agreement to arbitrate *this* specific dispute and, on that basis, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

I.

*The First Lawsuit*

Friends and Penick have been in a dispute over a 2300 square foot mosaic map depicting the undersea life of La Jolla's submarine canyons and shorelines (the map), since 2012. Friends, a 501(c)(3) non-profit charitable organization dedicated to preserving La Jolla's public parks and beaches, hired Penick, a licensed contractor experienced in decorative concrete installations, to construct the map in March 2008. Friends paid Penick a little over $111,000 for construction of the map. Penick completed construction of the map in September 2008. But the map began to deteriorate before it opened to the public and after the parties' unsuccessful attempts to repair it, the City of San Diego deemed the map a public health hazard and permanently closed it in 2012.

Penick and Friends argued over who was responsible for the map's deterioration. In 2013, Friends filed its first lawsuit against Penick alleging multiple causes of action based on Penick's alleged defective construction of the map. The parties settled that lawsuit in April 2015 and executed an "Amended and Restated Settlement and Release Agreement" (the Settlement Agreement).

The Settlement Agreement required each side to take certain actions toward installing a new map. Penick's obligations are specified in sections 1.0 ("Removal Of The Map"), 1.1 and 2.1 ("Obligations Of Penick") of the Settlement Agreement, and included removal of the embeds[1] and demolition of the existing map; installation of the new map; and providing a one-year limited warranty for the new map. Further, under section 2.1, subdivision (h), "Penick shall contribute a total of $50,000.00 to Friends for construction of the [new map], which can be a combination of money, materials, and/or services."

Friends' obligations are specified in section 2.2 ("Obligations Of The Friends"), and included inspection and safekeeping of the embeds after their removal; hiring and paying for all fees associated with the mosaic artist's creation of a new mosaic for Penick to install; installation and maintenance of permanent fencing to provide a single point of public access and signage to prohibit activities that could damage the newly installed map; and appointment of one person to be the " 'Friends' Representative' " with Penick during demolition, installation, and the one-year warranty period.[2] It was further specified in section 2.1, describing Penick's obligations, that Friends would pay for Penick's removal of the decomposed granite system over the sub-slab.

---

[1]     There were approximately 250 bronze embeds in the mosaic map illustrating the undersea life.

[2]     It was specified that the Friends' Representative could not be an attorney or certain individuals with whom Penick had conflict during the parties' earlier dealings.

## II.

### *Arbitration Provision of the Settlement Agreement*

The Settlement Agreement contains a provision governing "Dispute Resolution." Section 6.10 provides:

> "*Except for any dispute regarding the indemnification or release provisions of this Agreement, for which the Parties retain all rights available to them, any disputes arising between the Parties at any time, e.g., during demolition of the MAP to the sub-slab, during construction of the NEW MAP, during the one-year limited warranty period, etc., shall be resolved as follows:*
>
> (a)  If the dispute cannot be settled through direct discussions between Penick and the Friends' Representative, the Parties shall attempt to settle the dispute by mediation before recourse to any other method of dispute resolution. Unless the Parties agree otherwise, the mediation shall be conducted in accordance with the Construction Mediation Rules of the American Arbitration Association.
>
> (b)  *If mediation does not resolve the dispute, the dispute shall be resolved through binding arbitration. Unless otherwise agreed by the Parties, the arbitration shall be conducted before a single arbitrator who must have had at least 10 years experience in the construction industry in a capacity other than as an attorney, e.g., contractor, engineer, architect, etc. No discovery shall be allowed, and the Parties cannot be represented at the arbitration by an attorney. Each side may present the testimony of one expert at the arbitration hearing.*
>
> (c)  The Friends can only have the Friends' Representative at any mediation and/or arbitration. Any other person shall be excluded at the request of Penick.
>
> (d)  The arbitrator(s)' decision shall be enforceable in a court of law and judgment shall be entered in accordance with such decision." (Italics added.)

As to the release provision, Section 5.1 ("Release Of Claims") sets forth a general release of claims by the parties. Each party released "all claims of every kind whatsoever . . . whether known or unknown, . . . based upon or

4

arising out of the MAP Construction Contract, the MAP, the NEW MAP, the Action or any conduct, event, statement, utterance, publication . . . or occurrence prior to the Effective Date[.]" Sections 5.3 ("Matters Not Included In The Releases") and 5.3.1 provided that: "The Releases do not include any liability or obligation created by this Agreement."

The Settlement Agreement's final section, section 6.15 ("Choice Of Law"), provided in part: "[T]he parties agree the court in the Action shall retain jurisdiction for purposes of enforcing this Agreement."

## III.

### *The Current Lawsuit*

After executing the Settlement Agreement, Penick removed the embeds and finished demolition of the existing map. Friends spent approximately $300,000 to hire a mosaic artist who created a mosaic on mesh for Penick to install and obtained permits and approvals for installing the new map. In January 2018, Friends notified Penick that it was nearing completion of the off-site fabrication of the mosaic and requested that Penick schedule installation of the new map and make payment of its $50,000 contribution. At this point, a new dispute arose between the parties.

Penick claimed the Settlement Agreement did not require it to install the new map at its sole cost; rather its financial obligation to Friends was capped at $50,000. Under Penick's interpretation of the Settlement Agreement, Friends was responsible for paying Penick the cost of installing the new map. Friends disagreed, contending that the Settlement Agreement required Penick to install the new map at its sole cost *and* contribute $50,000 to the project.

After informal discussions failed to resolve the dispute, the parties went to mediation in December 2019, at Friends' request. Friends' attorney

5

was not permitted at mediation, and Friends' representative (not an attorney) attended mediation alone. Mediation was unsuccessful.

In the meantime, to move forward and mitigate further loss, Friends hired another contractor to install the new map and another company to provide construction management services during installation, at a cost of over $600,000 to Friends.

In June 2020, Friends filed the pending lawsuit against Penick, asserting causes of action for breach of contract and declaratory relief. Friends alleged that it had "materially performed" all of its obligations under the Settlement Agreement, but Penick is in breach of the Settlement Agreement "by failing and refusing to perform its obligations," including failing to install the new map at its costs and failing to contribute $50,000 to Friends. Friends sought damages and a judicial declaration regarding Penick's obligations under the Settlement Agreement. In particular, Friends requested a determination that Penick's refusal to perform under the Settlement Agreement "constitutes a failure of consideration to [Friends] for any release of [Penick] from claims based upon, relating to, or arising out of the MAP Construction Contract, The MAP, the NEW MAP, the Action, or any conduct, event, statement, utterance, publication or occurrence" prior to the Settlement Agreement's effective date.

In August 2020, Penick moved to compel arbitration. Friends opposed the motion, arguing the arbitration provision did not apply to the current dispute, and if it did, it is unconscionable. After a hearing in September 2020, the trial court denied Penick's motion. It found that Penick failed to carry its burden of establishing the existence of an agreement to arbitrate the claims asserted in Friends' complaint, and, assuming an enforceable

6

arbitration agreement exists, it found the arbitration agreement unconscionable. Penick timely appealed.

DISCUSSION

I.

*Interpretation of Arbitration Agreements*

"A party to an arbitration agreement may petition the court to compel other parties to arbitrate a dispute that is covered by their agreement." (*Jones v. Jacobson* (2011) 195 Cal.App.4th 1, 15; Code Civ. Proc.,[3] § 1281.2.) A court must order arbitration "if it determines that an agreement to arbitrate the controversy exists[.]"[4] (§ 1281.2.) Through California's detailed statutory scheme regarding arbitration, the Legislature has expressed a " 'strong public policy in favor of arbitration as a speedy and relatively inexpensive means of dispute resolution.' " (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 9.) "Doubts as to whether an arbitration clause applies to a particular dispute are to be resolved in favor of sending the parties to arbitration. The court should order them to arbitrate unless it is clear that

---

[3] All further undesignated statutory references are to the Code of Civil Procedure, unless otherwise indicated.

[4] Although none apply here, there are four limited grounds for not ordering parties to arbitrate a dispute: (1) the petitioner has waived the right to compel arbitration; (2) grounds exist for rescission of the arbitration agreement; (3) to avoid conflicting rulings on a common issue of law or fact where a party to the arbitration agreement is also a party to a pending action with a third party arising out of the same transaction; and (4) the petitioner is a state or federally chartered bank seeking to enforce an arbitration agreement against a consumer where the purported contractual relationship was fraudulently created by nonconsensual and unlawful use of the consumer's personal identifying information. (§ 1281.2, subds. (a)–(d).)

7

the arbitration clause cannot be interpreted to cover the dispute." (*United Transportation Union v. Southern Cal. Rapid Transit Dist.* (1992) 7 Cal.App.4th 804, 808.)

However, while public policy favors arbitration, " ' "there is no policy compelling persons to accept arbitration of controversies which they have not agreed to arbitrate[.]" ' " (*Victoria v. Superior Court* (1985) 40 Cal.3d 734, 744 (*Victoria*); accord *Engineers & Architects Assn. v. Community Development Dept.* (1994) 30 Cal.App.4th 644, 653 (*Engineers*) ["There is no public policy favoring arbitration of disputes which the parties have not agreed to arbitrate."].) Because the right to arbitration rests upon contract, the existence of an agreement to arbitrate requires the mutual consent of the parties to arbitrate the particular dispute. (*HM DG, Inc. v. Amini* (2013) 219 Cal.App.4th 1100, 1109.)

"Whether an arbitration agreement applies to a controversy is a question of law to which the appellate court applies its independent judgment where no conflicting extrinsic evidence in aid of interpretation was introduced in the trial court." (*Brookwood v. Bank of America* (1996) 45 Cal.App.4th 1667, 1670; see also *San Francisco Police Officers' Assn. v. San Francisco Police Com.* (2018) 27 Cal.App.5th 676, 683 (*San Francisco Police*).) We are not bound by the trial court's construction of a written agreement that is "based solely on the instrument without extrinsic evidence." (*Slaught v. Bencomo Roofing Co.* (1994) 25 Cal.App.4th 744, 748.)

The parties agree de novo review applies to the trial court's interpretation of the arbitration provision. Although extrinsic evidence was

offered,[5] the trial court did not rely on it, nor did it make any credibility findings regarding any conflicts in the extrinsic evidence when it interpreted the arbitration provision.  Instead, the trial court relied on the four corners of the Settlement Agreement and applied maxims of contract interpretation to the agreement's plain language.[6]  We therefore review the arbitration provision de novo to determine whether it applies to this particular dispute.

---

[5]     The extrinsic evidence the parties provided in connection with the motion to compel arbitration included written declarations.  Penick objected to 32 statements in the declaration submitted by Friends.  In this appeal, Penick states in two footnotes and without citing any legal authority that the trial court improperly overruled its objections.  We may disregard conclusory arguments that are not supported by pertinent legal authority.  (*City of Santa Maria v. Adam* (2012) 211 Cal.App.4th 266, 286–287 (*City of Santa Maria*); *Dills v. Redwoods Associates, Ltd.* (1994) 28 Cal.App.4th 888, 890, fn. 1 (*Dills*); Cal. Rules of Court, rule 8.204(a)(1)(B).)  Accordingly, we decline to consider Penick's arguments regarding the trial court's ruling on its evidentiary objections.

[6]     On appeal, Penick contends Friends' attendance at mediation is relevant to establishing the existence of an agreement to arbitrate this dispute.  However, Penick did not raise this argument in the trial court, and it does not provide any legal authority to support its argument on appeal.  Failure to raise an argument in the trial court forfeits the claim on appeal, and arguments unsupported by pertinent legal authority may be disregarded.  (*City of Santa Maria, supra*, 211 Cal.App.4th at pp. 286–287; *Premier Medical Management Systems, Inc. v. California Ins. Guarantee Assn.* (2008) 163 Cal.App.4th 550, 564; *Dills, supra*, 28 Cal.App.4th at p. 890, fn. 1; Cal. Rules of Court, rule 8.204(a)(1)(B).)  Because Penick failed to properly raise this argument in the trial court and in its appeal, we decline to consider it.  Further, there may be reasons why Friends, as a publicly funded non-profit, would be willing to attend mediation while also believing the provision for dispute resolutions did not apply to the present dispute.  Nevertheless, this is an issue of fact that requires resolution by a trier of fact and not the appellate court.

9

II.

*Burden of Proof*

Before proceeding to the merits, we address the threshold issue of what burden of proof each party carries in a motion to compel arbitration. The trial court determined that Penick, as the moving party, had the burden to prove by a preponderance of the evidence the existence of an agreement to arbitrate and that the dispute is covered by the agreement. If Penick made that initial showing, the court would then shift the burden to Friends, as the resisting party, to prove by a preponderance of the evidence a ground for denial of arbitration, including, for example, fraud or unconscionability. Applying this framework, the court concluded Penick failed to carry its burden of establishing an agreement to arbitrate the claims asserted in Friends' complaint.

On appeal, Penick challenges the trial court's allocation of the burden of proof, contending that it only needed to show the existence of an agreement to arbitrate, while Friends had the burden to show the agreement did not cover the claims Friends alleged in the complaint. Unsurprisingly, Friends argues the trial court had it right.

There is case law to support Penick's position, as well as that of the trial court and Friends. Courts of Appeal have arrived at different conclusions as to who bears the burden for proving the dispute is covered by the agreement to arbitrate. For example, it has been held that "[b]efore a party may be compelled to arbitrate a claim, the petitioning party has the burden of proving the existence of a valid arbitration clause and the dispute is covered by the agreement." (*Larian v. Larian* (2004) 123 Cal.App.4th 751, 760; accord *San Francisco Police, supra,* 27 Cal.App.5th at p. 683 ["The party

10

requesting arbitration bears the burden of proving the existence of an agreement to arbitrate a particular controversy."].)

Other Courts of Appeal have placed the burden of proof on "the party opposing arbitration to demonstrate that an arbitration clause *cannot* be interpreted to require arbitration of the dispute." (*Coast Plaza Doctors Hospital v. Blue Cross of California* (2000) 83 Cal.App.4th 677, 686–687 (*Coast Plaza*); accord *Aanderud v. Superior Court* (2017) 13 Cal.App.5th 880, 890 (*Aanderud*) ["It is the party opposing arbitration who bears the burden to show the arbitration provision cannot be interpreted to cover the claims in the complaint."]; *Khalatian v. Prime Time Shuttle, Inc.* (2015) 237 Cal.App.4th 651, 659 ["The party opposing arbitration has the burden to show that the agreement does not apply to the dispute."]; *Titolo v. Cano* (2007) 157 Cal.App.4th 310, 316–317 [same]; *EFund Capital Partners v. Pless* (2007) 150 Cal.App.4th 1311, 1321 (*EFund*) [same]; and *Buckhorn v. St. Jude Heritage Medical Group* (2004) 121 Cal.App.4th 1401, 1406 (*Buckhorn*) [same].)

We conclude that before compelling the parties to arbitrate, the moving party has the burden of proving the existence of an agreement to arbitrate the particular controversy at issue. We reach this conclusion based on analysis of the California Supreme Court's discussion of the burden of proof for a motion to compel arbitration in *Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394 (*Rosenthal*) and *Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951 (*Engalla*). But, however the burden of proof is allocated, we ultimately conclude that Penick has not shown the existence of an agreement to arbitrate the claims in Friends' complaint, *and* that Friends has shown that its claims fall outside the scope

11

of the arbitration provision. Thus, our affirmance of the trial court's order does not rest on burden of proof.

Our Supreme Court addressed "the procedures by which petitions to compel arbitration [under section 1281.2] are to be determined in the superior courts" in *Rosenthal*. (*Rosenthal, supra*, 14 Cal.4th at p. 402.) To provide trial courts with guidance on the correct procedures for deciding a section 1281.2 petition, the court stated that: "[W]hen a petition to compel arbitration is filed and accompanied by prima facie evidence of a written agreement *to arbitrate the controversy*, the court itself must determine whether the agreement exists and, if any defense to its enforcement is raised, whether it is enforceable. Because the existence of the agreement is a statutory prerequisite to granting the petition, the petitioner bears the burden of proving its existence by a preponderance of the evidence. If the party opposing the petition raises *a defense* to enforcement--either fraud in the execution voiding the agreement, or a statutory defense of waiver or revocation (see § 1281.2, subds. (a), (b))--that party bears the burden of producing evidence of, and proving by a preponderance of the evidence, any fact necessary to the defense." (*Id.* at p. 413, italics added.)

In *Rosenthal*, plaintiffs resisted enforcement of an arbitration clause contained in a client agreement executed in the purchase of securities; they alleged the arbitration agreements were void for fraud in their execution. (*Rosenthal, supra*, 14 Cal.4th at p. 402.) After setting out the burden-shifting framework, discussed *ante*, our high court held a party opposing arbitration based on the defense of fraud in the inducement must show fraud in the making of the arbitration agreement specifically, reasoning that "[b]y entering into the arbitration agreement, the parties established their intent that disputes coming within the agreement's scope be determined by an

12

arbitrator rather than a court; this contractual intent must be respected even with regard to claims of fraud in the inducement of the contract generally." (*Id.* at p. 416.)

A year later, the Supreme Court again addressed the burden of proof for a motion to compel arbitration in *Engalla*. It reaffirmed that "[t]he petitioner bears the burden of proving the existence of a valid arbitration agreement by the preponderance of the evidence, and a party opposing the petition bears the burden of proving by a preponderance of the evidence any fact necessary to its *defense*." (*Engalla*, *supra*, 15 Cal.4th at p. 972.) As in *Rosenthal*, the party resisting arbitration raised defenses to enforceability of the arbitration agreement, including fraud and waiver. (*Id.* at 960.) Discussing the resisting party's burden to prove a fraud defense, the high court explained that "the petition to compel arbitration is not to be granted when there are grounds for rescinding the agreement. Fraud is one of the grounds on which a contract can be rescinded. [Citation.] In order to defeat a petition to compel arbitration, the parties opposing a petition to compel must show that the asserted fraud claim goes specifically ' "to the 'making' of the agreement to arbitrate," ' rather than to the making of the contract in general." (*Id.* at pp. 916–917.)

Under the burden-shifting rules set forth in *Rosenthal* and *Engalla*, the Supreme Court delineated two separate categories: 1) the moving party bears the burden of proving the *existence* of an agreement; and 2) the opposing party bears the burden of proving any *defenses* to the arbitration agreement's enforcement. It is clear from the discussion in *Rosenthal* and *Engalla* that the Supreme Court did not contemplate that the opposing party's burden was to affirmatively show that the agreement to arbitrate covered the dispute. Rather, it is a burden to prove affirmative defenses to

13

the enforceability of the agreement, such as fraud in the execution voiding the agreement, or a statutory defense for rescission, including waiver or revocation.  Such affirmative defenses do not arise without a valid agreement to arbitrate the dispute.  In other words, such defenses presuppose there is "prima facie evidence of a written agreement *to arbitrate the controversy*." (*Rosenthal*, *supra,* 14 Cal.4th at p. 413, italics added.)  And it is the petitioning party who must allege "the existence of a written agreement to arbitrate *a controversy* and that a party to the agreement refuses to arbitrate *that controversy*." (§ 1281.2, italics added.)  Thus, we cannot conclude from the Supreme Court's discussion in *Rosenthal* and *Engalla*, and from the plain language of section 1281.2, that the moving party can meet its prima facie case to compel arbitration by simply showing the existence of *any* agreement to arbitrate—it must be an agreement to arbitrate the particular controversy.

Decisions by Courts of Appeal that have placed the burden on the resisting party to prove the arbitration agreement does not cover the dispute appear to have their origins in *Coast Plaza*, *supra*, 83 Cal.App.4th at pages 686–687.  (See e.g., *EFund*, *supra*, 150 Cal.App.4th at p. 1321; *Buckhorn*, *supra*, 121 Cal.App.4th at p. 1406.)  *Coast Plaza* appears to have deduced this concept from California's general policy favoring arbitration and that any doubts are to be resolved in favor of arbitration.  (*Coast Plaza*, at pp. 686–687.)  According to the *Coast Plaza* court, under these general principles favoring arbitration agreements, "[i]t seems clear that the burden must fall upon the party opposing arbitration to demonstrate that an arbitration clause *cannot* be interpreted to require arbitration of the dispute."  (*Ibid.*)  There is no mention of *Rosenthal* or *Engalla* in *Coast Plaza*, however.

Although California's statutory scheme favors arbitration, arbitration agreements are fundamentally contracts to which ordinary rules of contract

14

interpretation apply. (*In re Tobacco Cases I* (2004) 124 Cal.App.4th 1095, 1104 (*Tobacco Cases I*).) Our Supreme Court has cautioned that "judicial enthusiasm for alternative methods of dispute resolution must not in all contexts override the rules governing the interpretation of contracts." (*Victoria, supra,* 40 Cal.3d at p. 739.) As the high court has explained, "[u]nder statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. [Civ. Code, § 1636.]." (*AIU Ins. Co. v. Superior Ct.* (1990) 51 Cal.3d 807, 821–822.) The core question for the court in determining whether an agreement to arbitrate exists, as with any contract, is whether the parties mutually assented to the agreement. There is no public policy to compel arbitration of disputes the parties did not intend to arbitrate. (*Victoria, supra,* 40 Cal.3d at p. 744; *Engineers, supra,* 30 Cal.App.4th at p. 653.) Imposing a burden on the party opposing arbitration to prove the arbitration does not apply to the dispute goes too far afield, favoring arbitration ahead of what the parties intended to arbitrate. Because the mutual assent of the parties is paramount, the burden to prove the existence of an agreement to arbitrate the particular dispute should fall on the moving party as part of its prima facie case.

Finally, common sense also leads us to our conclusion. Penick contends the mere existence of the arbitration provision in the Settlement Agreement should satisfy its burden to compel arbitration. Yet this would allow a party moving for arbitration to satisfy its burden by simply holding up *any* arbitration agreement signed by the parties, irrespective of whether the agreement is relevant to the parties' dispute. It would be a rather unmeaningful prima facie case if Penick could satisfy its burden by simply presenting a settlement agreement (that is arguably ambiguous) to the court,

15

"especially when the existence and enforceability of the agreement to arbitrate is the very issue before the trial court." (*Rosenthal*, *supra*, 14 Cal.4th at p. 413.)

However, as we stated at the outset, our disposition of this appeal does not turn on the burden of proof. Although we conclude that Penick has the burden of proving the arbitration agreement covers this dispute and Penick has not met its burden, we also conclude that Friends has shown that the dispute falls outside the scope of the arbitration provision. Thus, our affirmance of the trial court's order does not rest on burden of proof.

III.

*Friends' Claims Fall Outside the Scope of the Arbitration Provision*

"Arbitration of a claim is appropriate 'only where the court is satisfied that the parties agreed to arbitrate *that dispute.*'" (*Moritz v. Universal City Studios, LLC* (2020) 54 Cal.App.5th 238, 246; see § 1281.2.) "'When deciding whether the parties agreed to arbitrate a certain matter . . . courts generally . . . should apply ordinary state-law principles that govern the formation of contracts.'" (*Sandquist v. Lebo Automotive, Inc.* (2016) 1 Cal.5th 233, 244.) "'The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties. (Civ. Code, § 1636.) If [the] contractual language is clear and explicit, it governs. (Civ. Code, § 1638.).'" (*Tobacco Cases I, supra*, 124 Cal.App.4th at p. 1104.) "A court must view the language in light of the instrument as a whole and not use a 'disjointed, single-paragraph, strict construction approach[.]'" (*Ticor Title Ins. Co. v. Rancho Santa Fe Assn.* (1986) 177 Cal.App.3d 726, 730 (*Ticor*).) "If possible, the court should give effect to every provision. (Civ. Code, § 1641; [Citation].) An interpretation which renders part of the instrument to be surplusage should be avoided." (*Ticor*, at p. 730.)

When an instrument is susceptible to more than one interpretation, the contract's provisions must be interpreted in "their ordinary and popular sense," unless "used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed." (Civ. Code, § 1644.) If the court determines a contract is ambiguous, various maxims of contract interpretation may guide the court in its interpretation of the agreement.

The maxim *expressio unius est exclusio alterius* (the inclusion of one thing implies exclusion of others) acknowledges that a contract drafter's

17

choice to specify one thing tends to exclude others. (*Cundall v. Mitchell-Clyde* (2020) 51 Cal.App.5th 571, 584, fn. 9 (*Cundall*).) Under another maxim, *ejusdem generis* (of the same kind), a list of specific items or factors is controlling over general statements, meaning a general term or category will be restricted to those things that are akin to the specifically enumerated items. (*Nygard, Inc. v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027, 1045 (*Nygard*).)

Courts are also to avoid interpretations that would lead to unreasonable or absurd results. (*Roden v. AmerisourceBergen Corp.* (2010) 186 Cal.App.4th 620, 651 (*Roden*).) " 'When an instrument is susceptible to two interpretations, the court should give the construction that will make the instrument lawful, operative, definite, reasonable and capable of being carried into effect and avoid an interpretation which will make the instrument extraordinary, harsh, unjust, inequitable or which would result in absurdity.' " (*City of El Cajon v. El Cajon Police Officers' Assn.* (1996) 49 Cal.App.4th 64, 71 (*City of El Cajon*).)

With these contract principles in mind, we now turn to the merits. Here, the trial court determined the dispute as pled in Friends' complaint concerned the release provisions of the Settlement Agreement and the agreement does not evince the parties' intention to arbitrate this specific dispute. The trial court's determination of the gravamen of Friends' complaint is a legal determination subject to de novo review. (*Richmond Compassionate Care Collective v. 7 Stars Holistic Foundation, Inc.* (2019) 32 Cal.App.5th 458, 468.)

The parties agree release and indemnity disputes are excluded from the scope of arbitration. Section 6.10 of the Settlement Agreement exempts from arbitration "any dispute regarding the indemnification or release provisions

18

of this Agreement[.]"  They disagree, however, on whether the lawsuit concerns Penick's release.  Friends contends it does.  It argues "a release of liability is a contract whereby one party gives up certain rights against the other, in exchange for some bargained-for consideration or benefit."  And Penick's failure to perform under the Settlement Agreement is a failure of consideration owed to Friends for release of Penick from its claims.  Penick contends "[t]he true gravamen of Friends' complaint is that Penick failed to perform its obligations pursuant to the [S]ettlement [A]greement."  Rather than a dispute over the "release provisions" of the Settlement Agreement, Penick argues the dispute concerns Penick's obligations under section 2.1 ("Obligations Of Penick.").

In determining whether an arbitration provision applies to a certain controversy, we first identify the controversy and then decide whether that controversy is within the scope of the arbitration provision.  (*Tobacco Cases I*, *supra*, 124 Cal.App.4th at p. 1106; accord *Coast Plaza*, *supra*, 83 Cal.App.4th at pp. 684–685.)  To identify the controversy, the court examines "the specific acts of alleged wrongdoing and not just the form of the claim."  (*Drell v. Cohen* (2014) 232 Cal.App.4th 24, 29–30.)  Rather than interpreting the written agreement at this step in the analysis, the court assesses the nature of the dispute *as pled in the complaint*.  (*Tobacco Cases I*, at p. 1106; *Coast Plaza*, at pp. 684–685.)

In its complaint, Friends alleged that "in consideration for [Friends'] agreement to release" its construction defect claims against Penick, Penick agreed to replace the existing map with the new map "at its cost" and to contribute $50,000 to Friends "as additional consideration."  Friends alleged it has "materially performed" all of its obligations under the Settlement Agreement, but Penick is in breach of the Settlement Agreement "by failing

19

and refusing to perform its obligations," including failing to install the new map at its costs and failing to contribute $50,000 to Friends. As for relief, Friends requested damages and declaratory relief, including a judicial declaration that Penick's refusal to perform under the Settlement Agreement constitutes a failure to provide consideration for Penick's release.

Success on Friends' breach of contract claim in the present lawsuit is contingent on whether Penick has performed under the Settlement Agreement, and the answer to that question will determine whether Penick is entitled to release. Contrary to Penick's contention, Penick's obligation is not separate from its release. Rather, the gravamen of Friends' complaint is that Penick received the benefit of the Settlement Agreement, dismissal and release from the claims alleged in Friends' 2013 construction defect action, without providing Friends with the bargained-for consideration, $50,000 plus the cost of installing the new map. The controversy pled in Friends' current complaint, therefore, concerns Penick's release and, as we shall explain, it is exempt from arbitration under section 6.10 of the Settlement Agreement.

In determining the scope of the arbitration provision, the ordinary and popular sense of the contract's language governs unless the parties expressed a contrary intent. (*Tobacco Cases I*, *supra*, 124 Cal.App.4th at p. 1106.) Section 6.10 provides that "*any dispute regarding* the indemnification or release provisions of this Agreement" is outside the scope of disputes subject to arbitration. Black's Law Dictionary defines release in part as "[l]iberation from an *obligation*, duty, or demand[.]" (Black's Law Dict. (11th ed. 2019) p. 1542, col. 2, italics added.) Therefore, absent an intent by the parties to imbue "release" with a technical meaning, this dispute over Penick's $50,000 obligation falls within the exception to arbitration for any dispute regarding the release provisions.

20

Penick argues we should interpret the release exception in section 6.10 to be limited by section 5.3, "Matters Not Included In The Releases." Section 5.3 provides: "The Releases do not include any liability or obligation *created* by this Agreement." (Italics added.) Penick argues that because its "obligations to the [n]ew [m]ap were created only by the [S]ettlement [A]greement," the dispute over Penick's obligations "are not included in the release provisions" per section 5.3.

Penick's argument under section 5.3, however, is inconclusive because it does not consider a holistic interpretation of the Settlement Agreement. In particular, the argument ignores section 6.15, which provides that "the Parties agree the court in the Action shall retain jurisdiction for purposes of enforcing this Agreement." Like the relationship between releases and obligations, whether a party has performed its obligations under a settlement agreement is closely connected to enforcement of the settlement agreement. Under Penick's interpretation, any dispute concerning Penick's obligations would fall under the arbitration provision, nullifying the provision retaining jurisdiction for the court to *enforce* the Settlement Agreement. An interpretation that renders part of the contract to be surplusage is to be avoided. (*City of El Cajon*, *supra*, 49 Cal.App.4th at p. 71.)

*Tobacco Cases I* is instructive because it also involved a provision retaining jurisdiction for the court, similar to section 6.15. There, the Court of Appeal interpreted the scope of an arbitration provision in the context of a section in the agreement retaining exclusive jurisdiction for the court to enforce the terms of the agreement. (*Tobacco Cases I*, *supra*, 124 Cal.App.4th at pp. 1106–1107.) In noting that a contract's language must be interpreted holistically, the court concluded the section retaining jurisdiction for the trial court provided a "general rule" that all disputes relating to the agreement,

21

including disputes regarding the interpretation of the agreement's terms and provisions, were to be resolved in the trial court. (*Id.* at p. 1107.) The settlement agreement in this case, when considered as a whole, could be interpreted similarly, with section 6.15 setting forth a general rule that issues of enforcement, including disputes over the interpretation of terms in the agreement, are reserved for the trial court, while section 6.10 limits arbitration to a more narrow category of disputes.

The limitations of the arbitration provision come into focus under the maxims *expressio unius est exclusio alterius* and *ejusdem generis.* To resolve any ambiguity in the scope of the arbitration provision, it is appropriate to consider, as the trial court did, maxims of contract interpretation. (*Walker v. City of San Clemente* (2015) 239 Cal.App.4th 1350, 1373; *In re Tobacco Cases I* (2010) 186 Cal.App.4th 42, 48.) Under section 6.10, the parties agreed to arbitrate "any disputes arising between the Parties at any time, *e.g., during demolition of the MAP to the sub-slab, during construction of the NEW MAP, during the one-year limited warranty period, etc. . . .*" (Italics added.)

Under the maxim *ejusdem generis*[7] (of the same kind), "where specific words follow general words in a contract, 'the general words are construed to embrace only things similar in nature to those enumerated by the specific words.' " (*Nygard, supra,* 159 Cal.App.4th at p. 1045; accord *Ticor, supra,* 177 Cal.App.3d at p. 730 ["In sections where general words follow the enumeration of particular classes of things, a court will construe the general words as applicable only to the things of the same nature as the class enumerated."].) " 'The rule is based on the obvious reason that if [the drafter]

---

7      In its opening brief on appeal, Penick does not raise and has therefore waived its challenge to the trial court's application of *ejusdem generis*. (*Pfeifer v. Countrywide Home Loans, Inc.* (2012) 211 Cal.App.4th 1250, 1282 [issues not raised in the appellant's opening brief are deemed waived].)

had intended the general words to be used in their unrestricted sense, it would not have mentioned the particular things or classes of things which would in that event become mere surplusage.' " (*Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters* (1979) 25 Cal.3d 317, 330 fn. 10.)

In *Nygard*, for example, the court of appeal applied *ejusdem generis* to interpret a confidentiality agreement in an employment contract. (*Nygard, supra*, 159 Cal.App.4th at p. 1046.) The appellate court construed the phrase "any information, knowledge or data of the Company" as limited to the kinds of protected information that were enumerated in the sentence that followed: "Such information includes, without limiting the generality of the foregoing: methods of doing business; trade and design secrets; financial data as to costs, revenues, prices, profits; market information and sales or customer lists; suppliers and corporate contact names, addresses and telephone numbers; and records pertaining to employees, including their names, addresses and telephone numbers." (*Id.* at p. 1045.) Finding that all the enumerated examples related to "proprietary information or trade secrets," the court held that plaintiff's disclosures about his working conditions and the company's celebrity clientele did not violate the confidentiality agreement. (*Id.* at p. 1046.)

In this case, under the maxim of *ejusdem generis*, the language in the arbitration provision regarding "any disputes arising between the Parties at any time" is limited by the subsequent enumerated examples that the parties would arbitrate disputes "during *demolition* of the MAP to the sub-slab, during *construction* of the NEW MAP, [and] during the one-year limited *warranty period*." (Italics added.) These examples pertain to Penick's specific work on the new map's installation, while this dispute concerns the interpretation of the Settlement Agreement's terms. Because the dispute in

the present lawsuit is not akin to the enumerated examples, under the principle of *ejusdem generis*, it falls outside the arbitration provision's reach. (See *Nygard, supra,* 159 Cal.App.4th at p. 1045.)

The maxim *expressio unius est exclusio alterius* (*expressio unius*; the inclusion of one thing implies exclusion of others) lends further support to our construction of the arbitration provision. Under this maxim, the parties' choice to specify the types of disputes they intend to arbitrate—that is disputes that occur during demolition, construction, or the one-year warranty—tends to exclude other types of disputes. (*Cundall, supra*, 51 Cal.App.5th at p. 584, fn. 9.) *Dyna-Med Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379 (*Dyna-Med*) is instructive here. In *Dyna-Med*, the California Supreme Court applied the *expressio unius* maxim in interpreting whether the scope of relief available from an administrative agency included the authority to award punitive damages. There, the statutory list of remedies the agency was authorized to take following the phrase " 'including, but not limited to' " were all corrective rather than punitive. (*Dyna-Med*, at p. 1388.) Although the Supreme Court recognized " 'including, but not limited to' " is a phrase of enlargement, it concluded that interpreting the phrase as permitting the agency to take only corrective, nonpunitive action comported with *expressio unius* and other statutory construction doctrines. (*Id.* at pp. 1389–1391.)

Similarly, in this case, although the arbitration provision's use of "e.g." before the enumerated examples is a term of enlargement, *expressio unius* is still applicable to interpreting the scope of the arbitration provision. Under *expressio unius*, the list of exemplary arbitrable disputes illustrates the type of dispute the parties intended to arbitrate, and the list only identifies construction disputes. We therefore interpret, as did the trial court, that the

24

omission of a dispute similar in kind to the parties' current dispute as a deliberate choice to exclude such disputes from arbitration.[8]

Had the parties intended the scope of arbitration to be as all-encompassing as Penick now urges, the arbitration provision could have been drafted in broader terms.  For example, a "very broad arbitration clause" would be like the one at issue in *Coast Plaza*, which provided that: "*Any problem or dispute arising under this Agreement and/or concerning the terms of this Agreement*, other than a Utilization Review decision . . . *shall be arbitrated.*"  (*Coast Plaza*, *supra*, 83 Cal.App.4th at pp. 681, fn.2, 684.)  As another example, the arbitration agreement in *Aanderud* provided that: "You and We agree to arbitrate *all disputes, claims and controversies arising out of or relating* to (i) any aspect of the relationship between You and Us, whether based in contract, tort, statute or another legal theory; (ii) this Agreement or any other agreement concerning the subject matter hereof; (iii)  any breach, default, or termination of this Agreement; and (iv) the interpretation, validity, or enforceability of this Agreement, including the determination of the scope or applicability of this [arbitration clause]."  (*Aanderud*, *supra*, 13 Cal.App.5th at p. 886, italics added.)

The arbitration provisions addressed in *Coast Plaza* and *Aanderud* demonstrate the narrowness of the arbitration provision at issue here. Unlike in *Coast Plaza*, the parties in this case did not agree to arbitrate any dispute "arising under" the Settlement Agreement or "concerning the terms" of the Settlement Agreement.  (*Coast Plaza*, *supra*, 83 Cal.App.4th at p. 681, fn.2, italics omitted.)  The parties could also have delegated the " ' "gateway" ' " issue of arbitrability to an arbitrator, like in *Aanderud*, but

---

8    Contrary to Penick's assertion, the trial court correctly applied *expressio unius* by construing the enumerated examples as *illustrative,* not exhaustive*,* of the "sorts of disputes" the parties agreed to arbitrate.

did not. (*Aanderud, supra*, 13 Cal.App.5th at p. 891) And unlike the arbitration provision in this case, neither arbitration provisions in *Coast Plaza* nor *Aanderud* specifically listed the types of disputes to be arbitrated. In sum, the Settlement Agreement's arbitration provision could have been drafted to be all-encompassing but was instead drafted in much narrower terms.

The court must also resolve ambiguity in a contract in a manner that does not lead to an absurd result. (*Roden, supra,* 186 Cal.App.4th at p. 651.) Here, the parties' disagreement over Penick's $50,000 obligation boils down to a legal question of contract interpretation. Yet the arbitration terms set forth in the Settlement Agreement are not designed towards resolving this legal dispute. In particular, the requirement of a single arbitrator with at least 10 years of experience in the construction industry in a capacity *other than* as an attorney would make little sense in this context. Penick contends the arbitration terms do not preclude attorneys from acting as arbitrator outright, but the full context of the arbitration provision, including the examples of arbitrable disputes, demonstrates the parties intent to arbitrate disputes pertaining to the *construction* of the new map rather than matters of contract interpretation. Thus, the parties specified the arbitrator's primary qualifications shall be in the construction industry. Overall, to adopt Penick's interpretation and compel arbitration would lead to the absurd result of requiring binding arbitration of what is essentially a contract interpretation dispute in a forum designed to arbitrate construction disputes.

For these reasons, we conclude Friends' claims against Penick do not fall within the arbitration provision of the Settlement Agreement. The gravamen of the complaint concerns releases and as such the dispute is expressly excluded from arbitration. It is also not encompassed within the

26

scope of the arbitration provision because it is not the type of dispute the parties agreed to arbitrate, as our maxims of contract interpretation demonstrate the parties' intention to arbitrate construction matters and not matters of contract interpretation. Thus, we conclude the arbitration provision does not cover Friends' asserted claims.

## IV.

### *Unconscionability*

Because we affirm the trial court's order denying Penick's motion to compel arbitration on the basis that there is no agreement to arbitrate the specific claims asserted in Friends' complaint, we need not and do not reach the trial court's alternate finding of unconscionability.

## DISPOSITION

The order denying the motion to compel arbitration is affirmed.


DO, J.

WE CONCUR:


McCONNELL, P. J.


BENKE, J.

27